IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GARY TOOKER,

                    Plaintiff,                              CV 07-1119-ST

        v.                                                 FINDINGS AND
                                                           RECOMMENDATION

COMMISSIONER of Social Security,

_____Defendant._____

STEWART, Magistrate Judge:

## INTRODUCTION

        Plaintiff, Gary Tooker ("Tooker"), brings this action for judicial review of a final decision

of the Commissioner of the Social Security Administration denying his application for

Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security

Act ("SSA").  This court has jurisdiction under 42 USC §§ 405(g) and 1383(c).  For the reasons

set forth below, the Commissioner's decision should be AFFIRMED.

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

### I.  Administrative Proceedings

On March 13, 2003, Tooker protectively filed an application for SSI, alleging disability

based on combined impairments, including sleep apnea, plantar fascitis, obesity, and cervical,

thoracic, and lumbar spine impairments.[1]  AR 27-31, 37-40; *see also* AR 66-69, 76, 80.[2]  After

the claim was denied on August 7, 2003, Tooker filed an appeal on August 12, 2003.  AR 35, 27-

31, 34-36.  The appeal was mislaid, and Tooker filed a new claim on April 29, 2004, which the

Social Security Administration elected to treat as a request for reconsideration of the prior claim.

AR 40.  On August 4, 2004, Tooker's request for reconsideration was denied.  AR 41-43.

Tooker then requested a hearing before an ALJ.  AR 48.

After a hearing held on May 9, 2006 (AR 293-332), an ALJ issued a decision on July 27,

2006, unfavorable to Tooker.  AR 14-24.  Tooker requested review by the Appeals Council

which denied his request on May 31, 2007.  AR 8-10.  As a result, the ALJ's decision is the final

decision of the Commissioner.  20 CFR § 416.1481.  Tooker requests judicial review of the

Commissioner's final administrative decision.

### II.  Employment and Medical History

Born in 1966, Tooker completed high school and holds an associate's degree and a

license in airframe and power plant maintenance.  AR 85, 298.  He lived independently and

---

[1]  Tooker originally alleged disability beginning August 1, 1996, which roughly corresponds to the date seven years earlier when he was involved in an automobile accident.  Tooker filed a claim for disability insurance benefits ("DIB"), presumably based upon impairments resulting from the automobile accident, but the claim was later denied.  AR 77.  At the administrative hearing held on May 9, 2006, Tooker testified that his present claim for SSI benefits dates to the spring of 2002, when he left his most recent job at Fred Meyer due to severe foot pain.  AR 306.  Therefore, Tooker amended his onset date for this claim for SSI benefits to the date he filed his application, March 13, 2003.  AR 306.

[2]  Citations to "AR" refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket #11).

simultaneously held down two jobs as an auto mechanic and a convenience store clerk until he

was involved in an automobile accident on July 20, 1996.  AR 187, 297, 302-03.  Following a

few years off after the automobile accident, Tooker held a variety of jobs until April 2002, at

which time he again went off work due to severe pain in his feet.  AR 299.

### A.  Back Impairments

On July 20, 1996, Tooker was driving a vehicle that was sideswiped on the driver's door

by another vehicle traveling at about 45-50 miles per hour.  AR 303.  Tooker sustained a back

strain and "sideways whiplash."  *Id*.

Kenneth Manuele, D.O., treated Tooker for approximately a year following the accident.

On June 2, 1997, Dr. Manuele released Tooker from further treatment, noting that he was "still

having problems intermittently in his lower back, mid back, and neck[;] however, it is unlikely

that he will have significant improvement with further treatment."  AR 187.  On December 4,

1998, Dr. Manuele completed a Physical Residual Function Capacity ("RFC") Report,

presumably in support of Tooker's application for DIB.  AR 188-90.  In that report, Dr. Manuele

opined that Tooker could sit for a total of about six hours in an eight-hour workday, and stand or

walk for "at least [two]" hours in an eight-hour workday.  AR 188.

### B.  Post-Accident Jobs

About six months after Dr. Manuele released him from treatment, Tooker went back to

work part time.  During the winter and spring of 1999, Tooker worked part time washing dogs at

a dog grooming business.  AR 301-02.  That job ended when the owner sold the business.

AR 302.  Tooker next worked at a metalsmithing shop from the fall of 1999 until the spring of

2000.  AR 300.  He spent about one day assembling firearms and the rest of his time was spent

doing odd jobs while the company looked for a new head machinist.  AR 300.  Since Tooker

could not perform heavy work due to his back problems, the job fell through.  *Id*.

From the fall of 2000 until the late spring of 2002, Tooker worked about 35 hours per

week as a clerk/cashier in the photo and electronics department at Fred Meyer.  AR 211, 299-

300, 305.  He went on temporary disability leave from that job when he experienced increasing

difficulty with his feet, for which he again sought treatment from Dr. Manuele in April 2002.

AR 211, 299.

### C.  April 2002 Foot Problems

Dr. Manuele again treated Tooker beginning April 16, 2002.  AR 211.  At that time,

Tooker was working nearly full time at Fred Meyer, which required him to stand on a concrete

floor.  *Id*.  His heels had become steadily more painful in the preceding month.  Dr. Manuele

recommended that Tooker not work pending X-rays of his feet and advised him to take Motrin.

*Id*.  An X-ray of April 25, 2002 revealed a "bulky spurring of the plantar posterior cacaneous

with minor spurring at the insertion of the Achilles tendon" and diagnosed "[e]nthesopathy of the

calcaneus without acute findings of the foot."  AR 212.

Dr. Manuele again treated Tooker on May 7, 2002, extending his time off work through

May 17, 2002, and recommending consultation with a podiatrist to see if orthopedic inserts might

help with his bilateral heel and foot pain.  AR 209.  Tooker continued to be on short term

disability leave through the summer of 2002.  AR 208 (July 22, 2002 chart note extending leave

for two more months).  On June 3, 2002, Bruce Franz, D.P.M., examined Tooker, finding

bilateral heel spurs and a "deviation in the navicular 1st cuneiforme with arthritic degenerative

joint disease in that area."  AR 192.  Dr. Franz noted that Tooker's size and weight put a

"tremendous amount of pressure on his feet," hoped to accommodate Tooker with an orthotic device, and advised that Tooker should "begin the painful process of losing some of his weight." *Id*.

Dr. Manuele again saw Tooker on May 3, 2004.  AR 206.  At that time, Tooker was taking only Motrin for pain, his feet had an "unchanged tenderness pattern," and he had experienced a "mild [increase in] muscle spasm."  *Id*.

### D.  Treatment of Back Problems by FNP Carlson

In December 2004, Tooker left Dr. Manuele's care and began treating with Heidi Carlson, F.N.P., who referred him to Medford Open Imaging for an MRI.  AR 304.  FNP Carlson ordered cervical, thoracic, and lumbar MRIs.  AR 257-61.  At an appointment to review the results of those MRIs on February 15, 2005, FNP Carlson recommended referral to an orthopedist and diet, exercise, and weight loss.  AR 256.

### E.  Obesity

Over the last decade, Tooker's weight has fluctuated between 350 and 475 pounds.  AR 296-97.  The record repeatedly notes a diagnosis of obesity, or morbid obesity.  AR 199, 206-07, 211, 242, 246, 251-52, 256, 264-66.  Multiple doctors have recommended that Tooker lose weight, citing it as one of the factors that exacerbates the limiting effects Tooker's other impairments.  AR 192, 207, 247, 251, 256, 264-66.

### F.  Sleep Apnea

Tooker also suffers from sleep apnea.  On July 5, 2004, Joseph Schoenhals, M.D., examined Tooker, who reported going to sleep at strange times, getting to bed at 6:00 a.m., and not waking up until noon or 3:00 p.m.  AR 241.  Dr. Schoenhals recommended polysomnography

testing.  AR 243.  Tooker underwent a sleep study on September 11, 2004, which revealed

improvement in Tooker's sleep patterns with the use of a continuous positive airway pressure

("CPAP") machine.  AR 244-47.  Follow up appointments on November 9, 2004, March 8, 2005,

and October 5, 2005, indicate that Tooker experienced a "dramatic response" to the use of the

CPAP machine, was able to stay awake during the day, was going to bed at midnight and getting

up at about 8:00 a.m.  AR 264, 266.  He was also "napping only occasionally, much less than he

was before."  AR 264.

### III.  Physical RFC Report by Dr. Manuele

On November 8, 2004, about eight months after Tooker filed this claim for SSI benefits,

Dr. Manuele completed a second[3] Physical RFC Report concerning Tooker.  A month later on

December 15, 2004, Tooker had another appointment with Dr. Manuele.  AR 251.  Based on

their conversations, Dr. Manuele decided to amend certain answers he had provided on the RFC

Report.  AR 238, 251.  On January 7, 2005, Dr. Manuele amended the RFC Report.  AR 238-40,

251.  In a handwritten note accompanying the amended RFC Report, Dr. Manuele explained that

Tooker had "changed physicians secondary to displeasure over the answers [he] originally gave"

on the November 8, 2004 Physical RFC Report.  AR 276.  This amended RFC report states that

Tooker can sit for about four hours in an eight-hour workday, stand and/or walk for about four

hours in an eight-hour work day, stand no more than 10 minutes without changing position, and

must walk for about 5 minutes every 20-60 minutes.  AR 239.  The ALJ rejected these additional

limitations, relying instead on Dr. Manuele's earlier November 8, 2004 assessment.  AR 22.

---

[3]  The first Physical RFC Report by Dr. Manuele was completed on December 4, 1998, and involved Tooker's previous claim for DIB following the 1996 car accident.  AR 188-89.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 404.1520. Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, then the Commissioner proceeds to step two.  20 CFR § 416.920(b).

At step two, the Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, then the Commissioner proceeds to step three.  20 CFR § 416.920(c).

At step three, the Commissioner determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the impairment does not meet or equal one of the listed impairments, then the Commissioner proceeds to step four. 20 CFR § 416.920(d).

If the adjudication proceeds beyond step three, the Commissioner must determine the claimant's residual functional capacity ("RFC").  The RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by the impairments.  20 CFR § 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the Commissioner determines whether the claimant is able to perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates that he or she cannot perform work done in the past, the Commissioner proceeds to step five. 20 CFR § 416.920(e).

Finally, at step five, the Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpt. P, App. 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR § 416.920(f), 416.966.

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  However, at step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id*.

///

8 - FINDINGS AND RECOMMENDATION

## THE ALJ'S FINDINGS

At step one, the ALJ found that Tooker has not engaged in substantial gainful activity since April 30, 2002.  AR 18, Finding 1.  At step two, the ALJ determined that Tooker suffers from the severe impairments of cervical, lumbar, and thoracic disc disease, obesity, bilateral enthesopathy of the calcaneus, and obstructive sleep apnea.  AR 18-19, Finding 2.  At step three, the ALJ concluded that Tooker's impairments do not meet or equal any listed impairment.  AR 19, Finding 3.

The ALJ concluded that Tooker retains the RFC to lift and carry up to 10 pounds occasionally and less than 10 pounds frequently, sit for six hours out of an eight-hour workday, and stand and/or walk for six hours out of an eight-hour work day.  AR 19, Finding 4.  The ALJ also determined that Tooker:  (1) requires an option to periodically alternate sitting, standing, or walking; (2) can only sit for 45 minutes at a time and can stand for 10 minutes at a time; and (3) can occasionally twist and stoop, but never crouch or climb stairs or ladders.  *Id.*  Tooker must avoid even moderate exposure to extreme heat and cold, high humidity, perfumes, soldering fluxes, solvents, cleaners, and chemicals, and all exposure to fumes, odors, dusts, and gases.  *Id.*  Finally, Tooker is limited to simple, routine tasks.  *Id.*

At step four, the ALJ found that Tooker could not perform his past relevant work.  AR 22-23, Finding 5.  At step five, however, the ALJ concluded that Tooker could perform the sedentary, unskilled jobs of order clerk (DOT[4] 209.567-014), charge account clerk (DOT 205.367-014), and patcher (DOT 723.687-010).  AR 23-24, Finding 9, 329.  As a result, the ALJ found Tooker is not entitled to SSI benefits.  *Id.*

---

[4] *Dictionary of Occupational Titles* ("*DOT*"), US Dep't of Labor (rev. 4th ed. 1991).

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it applied proper legal standards and its findings are supported by substantial evidence in the record.  42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted).  If supported by substantial evidence, the Commissioner's decision must be upheld, even though the evidence may be susceptible to more than one rational interpretation.  *Andrews*, 53 F3d at 1039-40; *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001) (citation omitted) ("the court may not substitute its judgment for that of the Commissioner").

## DISCUSSION

Tooker contends that the ALJ erred by improperly rejecting his testimony, as well as the opinions of his treating doctors and a state agency reviewing physician.  As a result, he disputes the ALJ's RFC finding as failing to include additional limitations into his RFC, including manipulative restrictions and a restriction that he can stand no more than two hours in an eight-hour workday.  He also disputes the ALJ's step five finding, arguing that the full range of sedentary work is significantly compromised by his additional limitations.

///

///

///

## I. **Tooker's Testimony**

### A. **Legal Standard**

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments and "show that the impairment or combination of

impairments *could reasonably be expected* to (not that it did in fact) produce some degree of

symptom." *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996) (citations omitted) (emphasis

in original).  The claimant is only required to produce objective medical evidence of the

impairment, not of the symptom or its severity or its causal relationship to the impairment.  *Id* at

1282.  The claimant is also not required to show that the impairment could reasonably be expected

to cause the severity of the symptom, but "need only show that it could reasonably have caused

some degree of the symptom." *Id.*

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's

testimony regarding the severity of the symptom.  To determine whether subjective testimony is

credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id* at 1284 (citations omitted).

The following factors must also be considered:  the circumstances under which the

claimant testified, any contradictions or corroborations, the claimant's prior work record, the

nature of any symptoms and medical treatment, his daily activities, and any other factors

concerning the claimant's functional limitations and restrictions.  20 CFR § 416.929; SSR 96-7p,

1996 WL 374186, *3 (July 2, 1996).

If the ALJ finds the claimant's symptom testimony not to be credible, the ALJ '"must

specifically make findings which support this conclusion" and the findings "must be sufficiently

specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on

permissible grounds and did not arbitrarily discredit" it.  *Bunnell v. Smolen*, 947 F2d 341, 345-46

(9th Cir 1991) (*en banc*) (internal quotations and citations omitted).  Absent evidence of

malingering, the ALJ may reject symptom evidence only by giving clear and convincing reasons,

including which testimony is not credible and what facts in the record lead to that conclusion.

*Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998) (citation omitted); *Smolen*, 80 F3d at 1281,

1284.  With evidence of malingering, the ALJ must provide "specific, cogent reasons" for his

disbelief.  *Reddick*, 157 F3d at 722 (citation omitted).

**B.  <u>Hearing Testimony</u>**

Tooker testified that he has three sources of pain in his back:  his neck, mid back, and low

back.  AR 306-07.  He experiences pain in his back at a "constant two," but the pain sometimes

spikes up to a six or a seven, and occasionally reaches a 10.  AR 307.  The pain radiates out into

his arms and buttocks, most notably into his right arm and sometimes into his right hand.  *Id*.

When he left his job at Fred Meyer, he had severe pain in his feet which he attributed to being

constantly on his feet at work.  *Id*.  He takes Motrin (800 mg.) as an anti-inflammatory and

Tylenol III with codeine (30 mg.) for pain.  AR 305.  His pain causes fatigue, which in turn causes

irritability and difficulty concentrating.  AR 308, 311.  While discussed as a possible treatment

option for his back, surgery was an "option of last resort" based on the risks and lack of a

guaranteed fix to his back pain.  AR 307-08.

Tooker finds it difficult to walk, estimating that he could walk less than one block, or

about 100 yards, without rest or severe pain.  AR 308-09.  He is unable to stand more than 15

minutes unassisted and often needs "to lean over onto something" to get around.  AR 309.  He

estimates he could stand and walk less than one hour in an eight-hour work day.  *Id*.  Tooker also

experiences difficulties sitting and estimates that he could sit up to four hours on a "very good

day."  *Id*.  Tooker's "biggest chore" is to wash dishes daily and he vacuums "only when absolutely

necessary."  AR 314.

Although the CPAP machine has helped with the quality of his rest, he still has an

irregular sleep schedule.  AR 308, 312.

### C.  Analysis

Tooker contends that the ALJ erred in rejecting his testimony about symptoms related to

his sleep apnea and his ability to grasp and manipulate objects with his hands.  The essence of that

testimony is that he has an irregular sleep schedule and that his back pain radiates down into his

arms and hands, particularly on the right.  Tooker contends that these limitations should have been

included in the ALJ's RFC assessment and would preclude the work identified by the ALJ at step

five.

The ALJ found Tooker's statements regarding the "intensity of the pain and degree of

incapacity . . . inconsistent with the medical evidence of record."  AR 20.  The ALJ reviewed the

findings of the available X-rays and MRI scans, noted the absence of "electrodiagnostic tests that

would establish the presence of radiculopathy or neuropathy," and pointed out the lack of any findings of "dysfunction relating to [Tooker's] shoulders, elbows, wrists, hips, or knees." *Id.*

The ALJ specifically rejected any grasping or manipulative limitations based on the lack of any medical findings supporting such limitations, as well as on the conclusions of both Dr. Manuele and the state agency reviewing physicians in their Physical RFC Reports. AR 21. While Tooker argues that the reports that the ALJ credits were prepared before the January 2005 MRI scans, nothing in those scans hints at manipulative limitations, and Dr. Manuele did not add any such limitation when he amended his RFC Report in January 2005.

With regard to Tooker's contention of limitations relating to his obstructive sleep apnea, the ALJ reviewed the medical records dating between November 2004 and October 2005, correctly summarizing the essential findings that Tooker's irregular sleep patterns had significantly improved, if not resolved, with the use of a CPAP machine. AR 20-21, 264. This conflicts with Tooker's testimony at the hearing. AR 308. A conflict between a claimant's subjective complaints and the objective medical evidence is a legitimate reason to cast doubt on his credibility. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999).

In addition to the lack of support in the medical record for Tooker's testimony, the ALJ found Tooker not to be credible based upon his "highly implausible explanation" as to why he stopped treating with Dr. Manuele. AR 22. Tooker testified that he sought another treatment provider because he was "having a lot of problems with [his] back and really was uncertain as to why," thought it would be a good idea to undergo an MRI, and that Dr. Manuele "really didn't know where to go or who to see." AR 304; *see also* AR 317, 319-20. Tooker's first appointment with a different provider (FNP Carlson) was on December 20, 2004 (AR 257), five days after his

last appointment with Dr. Manuele,  AR 251.  He told Dr. Manuele that his "report [was] not correct in several parts[;] back pain stated to be worse esp[ecially] mid [and] lower back."  AR 251.  Dr. Manuele planned to change three areas of his report, which he did three weeks later.  AR 239-40, 251.  He also recommended that Tooker continue his medications (Motrin and Tylenol with codeine), lose weight, increase his exercise, continue use of the CPAP, and watch his blood pressure pattern.  AR 251.  Notably, neither the notes from the December 15, 2004 appointment, nor the notes from the appointment two months previously say anything about Tooker requesting an MRI scan or otherwise hinting that he thought Tooker might be able to pursue some other avenue of diagnosis or treatment.  AR 251-52.

An exhaustive review of the record reveals that the ALJ thoroughly evaluated the evidence and considered the testimony concerning Tooker's alleged limitations in light of that evidence.  As described above, the ALJ provided clear and convincing reasons for rejecting Tooker's subjective complaints as not entirely credible and that finding should not be disturbed.

## II.  Lay Witness Testimony

### A.  Legal Standard

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition.  *Dodrill v. Shalala,* 12 F3d  915, 918 (9th Cir 1993).  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996).  If the ALJ wishes to discount lay witness testimony, the ALJ must give reasons that are germane to the witness.  *Id.*

///

///

**B. Elaine Lortscher**

At the time of the administrative hearing in May 2006, Tooker was doing volunteer work teaching computer skills two days per week for two hours per day at South Coast Independent Living Services ("SCILS"), an organization that assists disabled individuals to get back into the work force. AR 298-99, 315-16. Tooker contends that the ALJ improperly discredited the testimony of Elaine Lortscher, his supervisor at SCILS, regarding the effect of his symptoms on his ability to grasp and manipulate objects with his hands.

Lortscher testified that she had witnessed Tooker drop things when he was tired, and recounted that she had "at times" witnessed Tooker struggling to be able to work with a tool on "something intricate" on the inside of a computer. AR 324-25. The ALJ found Lortscher's testimony "[un]persuasive on the issue of [Tooker's] symptoms and limitations" based on her "minimal contact" with Tooker, and the "more persuasive" November 8, 2004 (unamended) Physical RFC Report by Dr. Manuele. AR 22.

Tooker contests the ALJ's characterization of his contact with Lortscher as minimal, especially in comparison to his appointments with Dr. Manuele which were restricted to brief office visits weeks apart. Because doctors are charged with treating or curing their patients, their observations are afforded heightened deference. Thus, it was not error for the ALJ to rely more heavily on the observations of Tooker's treating doctor. As explained below, the ALJ also did not err by rejecting the conclusions in Dr. Manuele's amended RFC Report of January 7, 2005. Based on those same reasons, the ALJ also did not err by rejecting Lortscher's testimony and, in particular, did not err by declining to include dexterity limitations into Tooker's RFC.

///

16 - FINDINGS AND RECOMMENDATION

### III. Opinions of Tooker's Treating Physicians and Other Medical Providers

#### A. Legal Standard for Rejecting Opinions and Testimony of Medical Providers

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1195 (9th Cir 1999) (citation omitted). Generally, a treating physician's opinion is afforded the greatest weight in disability cases because "the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations and internal quotation marks omitted). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

A treating physician's opinion on the nature and severity of the claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the record. 20 CFR § 416.927(d)(2). An uncontradicted treating or examining doctor's opinion may only be discredited for "clear and convincing reasons." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) (citation omitted). If it is contradicted by the opinion of another doctor, the ALJ may reject the treating or examining doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F3d at 830 (citation omitted).

Similarly, the ALJ is "not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability" if he gives clear and convincing reasons for rejecting those opinions. *Reddick v. Chater*, 157 F3d 715, 725 (9th Cir 1998), quoting *Montijo v. Sec'y of Health & Human Servs.,* 729 F2d 599, 601 (9th Cir 1984). "A treating physician's

opinion on disability, even if controverted, can be rejected only with specific and legitimate

reasons supported by substantial evidence in the record.  In sum, reasons for rejecting a treating

doctor's credible opinion on disability are comparable to those required for rejecting a treating

doctor's medical opinion."  *Id* (citation omitted).

Testimony from a non-examining expert ordinarily does not warrant rejection of a treating

physician's opinion.  *Id* at 830-31; *Pitzer*, 908 F2d at 506 n4 ("The non-examining physicians'

conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the

conflicting observations, opinions, and conclusions of an examining physician").  In other words,

the ALJ may reject the testimony of an examining physician in favor of a non-examining

physician only by giving specific, legitimate reasons supported by substantial evidence in the

record.  *Roberts*, 66 F3d at 184.

**B.  Drs. Westfall and Bernstein**

Tooker argues that he ALJ erred by rejecting information provided by Mary Ann Westfall,

M.D., a state agency reviewing physician.  Dr. Westfall reviewed Tooker's medical record and

completed a Physical RFC Assessment form on July 30, 2004, four months before Dr. Manuele

completed his November 8, 2004 RFC Report.  AR 227-31.  Dr. Westfall found that Tooker could

stand and/or walk "at least 2 hours" in an 8-hour workday, and presumably concluded that he

could not stand and/or walk "about 6 hours" in that same time frame because she did not check

that box.  AR 228.  Tooker points out that this same finding was made nearly six years earlier by

Dr. Manuele in his assessment of December 4, 1998 (AR 188-89), and is consistent with the

notation made by an examining neurologist, William J. Bernstein, Ph.D., M.D., of the Oregon

Coast Neurology Clinic on July 23, 2003, that Tooker "can stand for 1 hour at a time and can walk about and [sic] 1/8 of a mile." AR 199.

The ALJ rejected this limitation, finding that Tooker could sit for six hours out of an eight-hour workday, and stand and/or walk for six hours out of an eight-hour work day. AR 19, Finding 4. In doing so, the ALJ cited "additional medical evidence . . . consistent with medical evidence in the record" which "justifies a conclusion that [Tooker's] impairments resulted in limitations differing from those concluded by the state examiners." AR 22. Additional evidence cited by the ALJ which post-dates Dr. Westfall's review includes a sleep study conducted in September 2004 (244-47), chart notes from Joseph Schoenhals, M.D., dated between November 2004 and October 2005 (AR 263-66), Dr. Manuele's November 8, 2004 Physical RFC Assessment, and lumbar, thoracic, and cervical MRIs from January 2005 (259-61). AR 19-22. The ALJ rejected the notion that Dr. Manuele's amendments to the Physical RFC Assessment in January 2005 were supported by the record, found the changes to be based entirely on Tooker's subjective complaints, and found that the form – even as amended – did not preclude sedentary work based on the testimony of the VE. AR 22. These reasons are well supported by the record. As noted by the ALJ, no objective or clinical findings support the amendments to the Physical RFC Report in January 2005. Because the ALJ properly discounted Tooker's testimony concerning his subjective complaints and limitations, as described above, the ALJ correctly rejected the amended RFC based on those same subjective complaints.

After examining Tooker on July 23, 2003, Dr. Bernstein found that Tooker "has no deficits with traveling, handling objects, hearing or speaking. He can lift or carry 10-20 [pounds] continuously and up to 40 [pounds] occasionally. He can stand for [one] hour at a time and can

walk about [an eighth] of a mile."  AR 199.  Tooker cites this last sentence as consistent with the

standing and walking limitation suggested by Dr. Westfall.  However, Dr. Bernstein's

examination notes say nothing about the total hours Tooker could stand or walk.  If anything,

Dr. Bernstein's conclusion that Tooker could stand for an hour at a time is less restricting than the

10 minute limitation the ALJ included in his RFC analysis.  Thus, Dr. Bernstein's notes do not

support further limitations to be included in the ALJ's RFC assessment.

## IV.  Obesity

The record amply supports the conclusion that Tooker is obese.  He argues that the ALJ

failed to follow SSR 02-01p, 2000 WL 628049 (Sept. 12, 2002),  by failing to properly consider

the effect of his obesity on his limitations.  However, a diagnosis of obesity – in itself – does not

mandate a finding of particular limitations.  Instead, SSR 02-01p directs the ALJ to consider the

effect, if any, of the obesity on the limitations otherwise established by the record.  The ALJ

expressly found Tooker's obesity to be a severe impairment.  AR 18.  As explained above, the

ALJ properly rejected certain limitations based on the entire record.  No additional or more severe

limitations attributable to his obesity are supported by the record.

## V.  Failure to Address Whether the Full Range of Sedentary Jobs Was Compromised

Tooker also contends that the ALJ erred by failing to address whether his limitations

significantly compromised Tooker's ability to perform the full range of sedentary work, thereby

violating SSR 83-12, 1983 WL 31253 (1983), and SSR 96-9p, 1996 WL 374185 (July 12, 1996).

This argument hinges on two assertions, namely that the ALJ either:  (1) failed to credit Tooker's

claims of limitations in his ability to grasp and manipulate objects; or (2) found that Tooker can

perform only three sedentary occupations, which in and of itself directs a finding that the ability to

perform the full range of sedentary work is significantly compromised.  Both of these assertions
are flawed.

With regard to the first of these assertions, Tooker testified that the pain he experiences in
his back "radiates out into [his] arms and [his] buttocks, notably [his] right arm" and that he
"sometimes . . . feel[s] pain in [his] right hand."  AR 307.  In addition, Elaine Lortscher, Tooker's
supervisor at SCILS, the job retraining agency where Tooker works part time, testified that she
had witnessed Tooker drop things when he was tired, and recounted seeking Tooker "at times"
struggling to be able to work with a tool on "something intricate" on the inside of a computer.
AR 324-25.  One medical record also notes that Tooker's right hand "goes to sleep [with]
prolonged computer use."  AR 257.  Based on these passing references to arm and/or hand
difficulties, Tooker contends that the ALJ erred by failing to include manipulative limitations into
his RFC.  This argument should be rejected.

The ALJ expressly declined to find any limitations in grasping or manipulating objects,
noting the lack of any medical findings to support such limitations, as well as the findings by
Dr. Manuele and the agency medical reviewers of no deficits in handling or fingering.  AR 21.
The ALJ's conclusion is well-supported in the record.  After an examination on July 23, 2003,
Dr. Bernstein stated that Tooker had "no deficits" in handling objects, and was "able to twirl a pen
well in both hands and transferred from hand to hand quite easily."  AR 199.  In his December 4,
1998 assessment, Dr. Manuele found that Tooker could frequently handle (perform gross
manipulation) and finger (perform fine manipulation).  Tr. 189.  Similarly, in his November 8,
2004 assessment (as amended January 7, 2005), Dr. Manuele found that Tooker's impairments did
not affect his ability to finger or handle objects.  AR 240.  In Tooker's pain and fatigue

questionnaires, any mention of arm or hand pain or limitations is conspicuously absent. *See* AR 96-102. Additionally, Dr. Westfall, the agency doctor who reviewed Tooker's medical records in July 2004, found no evidence of manipulative limitations. AR 229. Moreover, multiple sources note that Tooker spends up to two hours per day building model airplanes, an activity entirely inconsistent with an alleged limitation on manual dexterity. *See* AR 106, 115, 147, and 161.

Tooker points to an MRI taken on January 3, 2005, that post-dates both Dr. Manuele's physical RFC assessments and Dr. Bernstein's examination. The medical record following that MRI notes that Tooker has "[upper extremity] weakness occasional pins and needles worse [in right upper extremity]." AR 256. While this one reference in the record arguably could be interpreted to support such a limitation, it is at best ambiguous. It is within the province of the ALJ to interpret such evidence and not within the province of this court to substitute its judgment for that of the ALJ when the evidence is subject to interpretation. Accordingly, this reference to "occasional pins and needles" in Tooker's upper extremity is an insufficient basis, in light of the other evidence in the record, to support a finding that the full range of sedentary jobs is significantly eroded by Tooker's limitations. This court concludes that the ALJ properly excluded manipulative limitations from Tooker's RFC and rejects the argument that the job base is eroded by such a limitation.

With regard to the second assertion, Tooker contends that the ALJ found that he could only perform three of over 100 sedentary jobs, which is proof positive that his limitations significantly compromise the full range of sedentary work available to him. This argument mischaracterizes the testimony of the VE and the findings of the ALJ. The VE was not asked to identify *every* job that Tooker could perform. Instead, the VE was simply asked to identify jobs a

hypothetical person with the limitations identified in Dr. Manuele's November 8, 2004, and

January 7, 2005 Physical RFC assessments could perform.  AR 329-30.  In response to those

questions, which clearly asked not for the entire universe of all jobs Tooker could perform, but

instead for *representative* jobs, the VE testified that such jobs included sedentary, unskilled

positions as an order clerk (DOT 209.567-014), charge account clerk (DOT 205.367-014), and

patcher (DOT 723.687-010).  *Id*.  Because the premise of Tooker's argument (*i.e.,* that the jobs

identified by the VE were the *only* jobs Tooker could perform) is flawed, the argument that the

VE's testimony proves that the full range of sedentary work is significantly compromised should

be rejected.

## VI.  Conflict Between the RFC and the Jobs Identified by the VE

Finally, Tooker argues that the VE's testimony about jobs a person with the RFC

identified by the ALJ could perform conflicts with the DOT.  Specifically, he contends that the

three jobs identified by the VE, which have GED Reasoning Levels of either 2 or 3, are precluded

by the a restriction to "simple, routine tasks."  Jobs with a GED Reasoning Level of 2 require the

worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or

oral instructions" and to "[d]eal with problems involving a few concrete variables in or from

standardized situations."  Jobs with a GED Reasoning Level of 3 require the worker to "[a]pply

commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic

form" and to "[d]eal with problems involving several concrete variables in or from standardized

situations."

Tooker fails to explain why a limitation to "simple, routine tasks" precludes jobs with

these GED Reasoning Levels.  Unlike jobs with GED Reasoning Levels of 4 or higher, jobs with

GED Reasoning Levels of 3 or lower do not require the interpretation of instructions or the ability

to deal with abstract variables.  Instead, the work is limited to problems involving several

*concrete* variables and *standardized* situations.  There is nothing inconsistent with those

requirements and the limitation to performing simple routine tasks.  Accordingly, this argument

should be rejected.

Tooker also argues that the order clerk and charge account clerk jobs, which require a

"Temperament" for "Attaining precise set limits, tolerances, and standards," is inconsistent  with

the VE's testimony that these are "routine" occupations.  However, Tooker does not fully explain

that argument, and this court discerns no conflict between this snippet of testimony by the VE and

the descriptions in the DOT.

Lastly, Tooker contends that the ALJ committed reversible error by failing to ask the VE if

her testimony was consistent with the DOT as required by SSR 00-4p, *4, 2000 WL 1898704

(Dec. 4, 2000).  An ALJ is required to determine if a VE's testimony conflicts with the DOT and,

if so, whether there is a reasonable explanation for that conflict.  *Masschi v. Astrue*, 486 F3d

1149, 1153-54 (9th Cir 2007).  However, a failure to do so is harmless if there is no actual conflict.

*Id* at 1154 n19.  As discussed above, the DOT descriptions for the three identified jobs are

consistent with the ALJ's RFC finding and hypothetical question to the VE.  Therefore, the VE's

testimony that a person with these limitations could perform those jobs was consistent with the

DOT, and any procedural error by the ALJ was harmless.

///

///

///

24 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Tooker asserts that his testimony, the testimony of certain medical sources, and the testimony of a lay witness were improperly discredited. This court finds no merit to those assertions, and finds no other basis on which to overturn the decision of the ALJ. Therefore, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due by October 31, 2008. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 16th day of October, 2008.


___/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge